NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOSE QUINTANA, | : | |
| | : | Civil Action No. 13-7135(JMV) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ADMINISTRATOR, et al., | : | |
| | : | |
| Respondents. | : | |

**JOHN MICHAEL VAZQUEZ, District Judge**

## I.  INTRODUCTION

This matter comes before the Court upon the Petition for a Writ of Habeas Corpus
("Petition") under 28 U.S.C. § 2254 (Dkt. No. 19) filed by Jose Quintana ("Petitioner"), an inmate
confined at New Jersey State Prison in Trenton, New Jersey.  Respondents filed an Answer to the
Petition. (Dkt. No. 23.)  Petitioner filed a Reply to Respondents' Answer. (Dkt. No. 24.)

## II.  FACTUAL BACKGROUND

The factual background of this case was summarized by the Appellate Division of the
Superior Court of New Jersey ("Appellate Division") upon Petitioner's direct appeal of his
conviction and sentence.[1]  *State v. Quintana*, 2006 WL 2085299 (July 28, 2006) ("*Quintana I*")
(Dkt. No. 27-1).

At approximately 11 p.m. on June 27, 1998, J.B., a fifteen-year-old high school student
who was staying with her aunt at Goldsmith Avenue in Newark, went to a Chinese take-out
restaurant about three blocks away to purchase food.  While she was walking back, a man, whom

---

[1] The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. §
2254(e)(1).

she subsequently identified as Petitioner, approached her from behind and asked her if she had the time.  When she said no, he began walking quickly toward her saying that he would walk with her.  After J.B. told him that there was no need for him to do so, Petitioner grabbed her, put her hand over her mouth, and told her not to scream or he would kill her.  He dragged her from the street into a backyard, pulled her to the ground, kissed her, put a knife to her neck, and made her perform fellatio upon him twice.  Petitioner next pulled down her pants to her ankles, breaking the button to her jeans, and raped her vaginally.  He then flipped her over, stepped on the side of her face, cut her lower back with his knife, and sat on her.  After he got dressed, he told J.B. to count to 1,000 before getting up.  He then walked away, leaving J.B. on the ground.

After J.B. counted to fifty, she got up quickly, ran to the back door of the house, and knocked.  Receiving no answer, she ran to the front and saw two men talking.  One of the men was Edward Brown, a Newark police detective, who had just pulled his car into his driveway.  Brown later testified that prior to his encounter with J.B., he heard a faint scream.  He remained in his car for five to ten minutes listening for any additional sound.  Hearing nothing, Brown took his four-year-old son out of the car and left his vehicle.  He saw a neighbor, Michael Brown (unrelated), and the two talked for a few minutes.  Toward the end of their conversation, Brown saw the man he later identified as Petitioner walk from the back of the home of an elderly couple named Smith.  Knowing that the Smiths retired early, Brown thought it odd that someone would be walking on their property at that late hour.  Brown handed his son to Michael so that he could investigate.  As the man walked south on Bergen Street, J.B. came out of the driveway with her shirt torn off and pulling up her pants.  She screamed: "Help me, I have been raped," and pointed at Petitioner.

Detective Brown quickly crossed the street, identified himself to Petitioner as a police officer, and showed his badge.  Petitioner took off running, and Detective Brown chased him for

several blocks until Brown caught him trying to jump a fence. Both men fell on the ground, with the detective landing on top. Petitioner resisted arrest, punching and kicking Detective Brown. Another off-duty Newark policeman who lived in the area saw the struggle and ran to help Brown subdue and handcuff Petitioner. Detective Brown then told Michael Brown, who arrived at the scene, to find the victim to see if she could identify Petitioner as her assailant. J.B. had returned to her aunt's house. She was taken to where Petitioner was held and identified him as the man who had raped her.

Later, J.B. made an in-court identification of the defendant. She testified that during the assault, Petitioner was in front of her and very close so she could see his face the entire time. She also said there was a light in the area. She said she was able to identify Petitioner by his face and by his voice, which she described as "scary." Detective Brown also made an in-court identification of Petitioner as the man he saw walking down the driveway and later captured, adding that he never lost sight of Petitioner during the chase.

Petitioner was taken to University Hospital for treatment of injuries he sustained when subdued by the police officers. Officer Edward Skulthorpe accompanied Petitioner in the ambulance. The officer testified that when Petitioner got off the stretcher, he patted Petitioner down and found a five-inch knife.

J.B. was examined at Beth Israel Medical Center by Dr. Stephen Amaefuna. He testified that when he examined J.B., she was crying and seemed terrified. Her eyes and nose were swollen, and there was a cut on the right side of her lower back. The pelvic examination revealed an abrasion to the vaginal wall, an oozing tear on the hymen which was only a few hours old, and semen in the vaginal area. Dr. Amaefuna also collected vaginal swabs as well as specimens of pubic hair, blood, saliva and nail clippings from J.B.

Detective Errello Spellman of the Newark Police Sexual Assault Unit was assigned to investigate the crime scene. She found a bag of Chinese food, a button from a pair of jeans, and a stone tile stained with fluid, which she submitted to the Newark forensic laboratory. She also took J.B.'s jeans and underpants to the lab. When Detective Spellman was given the knife, she took photographs of it.[2]

At trial, the State called Dr. Mitchell M. Holland, the laboratory director of the Bode Technology Group in Springfield, Virginia, to testify about the results of DNA analysis on seven items submitted for DNA examination: two blood samples of J.B.; three blood samples of Petitioner; a swatch of the jeans J.B. was wearing; and a portion of her panties. Dr. Holland testified there was insufficient DNA in the denim swatch to determine the DNA profile. However, a part of J.B.'s panties disclosed a mixed DNA profile. The major component matched the Petitioner 's DNA profile, and the minor component matched the profile of J.B. Dr. Holland opined that to a reasonable degree of scientific certainty, the sperm on the panties was Petitioner's. He explained that the chance of two people having the same DNA profile is one in thirteen quintillion for whites, one in 160 quintillion for blacks, and one in 1.51 to 4.1 quintillion for Hispanics. Petitioner is Hispanic; J.B. is black. On cross-examination, defense counsel questioned Dr. Holland's qualifications regarding statistical analysis of DNA results and challenged the process on which the results were based.

Petitioner testified in his own defense and denied kidnapping, raping, and assaulting J.B. He said that on the night of June 27, 1998, he left a soul-food restaurant at about 11 p.m. and was heading down Chancellor Avenue on his way to Elizabeth Avenue when he had a "bad feeling"

---

[2] For reasons unexplained, the knife could not be found and produced at trial, so the photographs were offered into evidence.

and decided to go home. As he got to the corner of Chancellor and Parkview, Petitioner said he suddenly "went black" and did not return to consciousness until he woke up and was being stomped by a police officer. He denied that he was ever at Goldsmith Avenue or that he possessed the knife shown in the photographs. *Quintana I*, 2006 WL 2085299, at *1-3 (Dkt. No. 27-1 at 4-9.)

## III.    CONVICTION & SENTENCING

In June 2002, Petitioner was convicted by an Essex County jury of the following charges stemming from events that occurred on June 27, 1998 (Dkt. No. 25-8 at 74): first-degree aggravated sexual assault upon a fifteen-year-old victim by vaginal penetration while armed with a weapon, N.J.S.A. 2C:14-2(a)(4) (count one); first-degree aggravated sexual assault upon a fifteen-year-old victim by fellatio while armed with a weapon, N.J.S.A. 2C:14-2(a)(4) (count two); first-degree aggravated sexual assault upon a fifteen-year-old victim by vaginal penetration during a kidnapping, N.J.S.A. 2C:14-2(a)(3) (count three); first-degree aggravated sexual assault upon a fifteen-year-old victim by fellatio during a kidnapping, N.J.S.A. 2C:14-2(a)(3) (count four); first-degree kidnapping to facilitate commission of a crime of aggravated sexual assault and without releasing the victim unharmed, N.J.S.A. 2C:13-1(b)(1) (count five); third-degree endangering the welfare of child under the age of sixteen, N.J.S.A. 2C:24-4(a) (count six); fourth-degree unlawful possession of a knife, N.J.S.A. 2C:39-5(d) (count seven); third-degree possession of a knife with intent to use against a person, N.J.S.A. 2C:39-4(d) (count eight); second-degree aggravated assault by causing or attempting to cause serious bodily injury, N.J.S.A. 2C:12-1(b)(1) (count nine); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2) (count ten); and third-degree making a terroristic threat, N.J.S.A. 2C:12-3(a) (count eleven). The jury also made specific findings that Petitioner had committed "crimes of violence" of

aggravated sexual assault, kidnapping, and aggravated assault, and that the victim was younger than sixteen. (Dkt. No. 26-5.)

After merger, Petitioner was sentenced to an aggregate sentence of a life term plus ten years (subject to the No Early Release Act, N.J.S.A. 2C:43-7.2) with twenty-five years of parole ineligibility. *Id.*

## IV.   POST-TRIAL PROCEEDINGS

*Direct appeal*: On October 16, 2003, Petitioner appealed his conviction and sentence (Dkt. No. 26-6), and the Appellate Division affirmed both. *Quintana I,* 2006 WL 2085299 (July 28, 2006) (Dkt. No. 27-1). On October 17, 2006, the New Jersey Supreme Court denied further review.  *State v. Quintana*, 188 N.J. 493 (Oct. 19, 2006) (Dkt. No. 27-2.)

*Post-conviction relief*: Petitioner filed a *pro se* petition for post-conviction relief ("PCR") on December 19, 2006, alleging that he was victimized by prosecutorial and judicial misconduct, and that he had suffered the ineffective assistance of counsel by his trial, appellate, and PCR attorneys. (Dkt. No. 27-3.)  Petitioner's September 2008 PCR certification further alleged "police fabrication" of knife evidence. (Dkt. No. 27-4 at 2-5.)  The PCR judge (who was also the trial judge) conducted a November 2009 hearing on Petitioner's ineffective assistance of counsel claim and issued a December 17, 2009 order denying the PCR petition. (Dkt. No. 27-6.)

On June 24, 2010, Petitioner appealed the denial of his PCR petition (Dkt. No. 27-7.)  On December 17, 2010, the Appellate Division remanded to PCR court for findings of fact and conclusions of law supporting denial of PCR. (Dkt. No. 27-8.)  The PCR judge's April 1, 2011 written opinion explained the bases for rejection of all of Petitioner's PCR claims. (Dkt. No. 27-9.)  The judge reserved decision on (and permitted supplemental briefing regarding) one issue

that had been raised for the first time at the post-remand oral argument: whether Petitioner was advised by his trial counsel as to the sentencing exposure he faced if convicted. (*Id.* at 3.)

Petitioner and his trial attorney were the only witnesses at the December 2, 2011 hearing on this issue. The purpose of the hearing was to collect evidence on Petitioner's claim that trial counsel: (1) misadvised him that the maximum sentence — if he were found guilty at trial — would be fifteen years, and (2) failed to advise him that the State had offered a plea bargain with a maximum exposure of ten years. (Dkt. No. 26-2 at 60-61, 65-68.) The PCR judge found that Petitioner's trial counsel was credible in his testimony that he had advised Petitioner of the appropriate possible sentences for the charged crimes. *Id.* at 67. The judge expressly found that Petitioner "was aware that his exposure was more than [fifteen] years," stating: "[E]ven if [that] weren't true, Mr. Quintana maintained his innocence throughout this trial, [and] he would not have taken a plea . . . Whether he received a plea offer of [ten] years or [fifteen] years, I'm satisfied that [fifteen] years for aggravated sexual assault of a minor with a weapon, kidnapping of a minor with a weapon were not enough for him to take a [fifteen] year plea. And so I am convinced that Mr. Quintana, even if he would have known, would not have accepted a plea, but I do find that he did know of the maximum exposure and deny his claim for post-conviction relief." (Dkt. No. 26-2 at 67-68.) At the hearing's conclusion, the PCR judge again denied relief. (Dkt. No. 27-11.)

Petitioner appealed the PCR court's December 2011 decision, including the issue of whether his conviction should be reversed due to supposed ineffective assistance of counsel because trial counsel allegedly failed to communicate the State's plea offer to Petitioner. (Dkt. Nos. 27-12, 27-13, 27-15.) In a December 7, 2012 written opinion (Dkt. No. 27-16) (*Quintana II*), the Appellate Division affirmed denial of PCR relief. After reviewing the record, the

Appellate Division was "neither persuaded by [petitioner's ineffective assistance] contention nor the *pro se* arguments contained in Quintana's multiple submissions." (Dkt. No. 27-16 at 7.) The *Quintana II* court invoked the "the two-factor test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and subsequently adopted by [the New Jersey] Supreme Court in *State v. Fritz*, 105 N.J. 42, 58 (1987) (implementing the *Strickland* standard for ineffective assistance of counsel claims under New Jersey['s] Constitution)." (Dkt. No. 27-16 at 7.) The Appellate Division explained: "First, Quintana must demonstrate that counsel's performance was deficient. *Strickland*, 466 U.S. at 687. Second, he must show there exists 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' *Id*. at 694." (Dkt. No. 27-16 at 7-8.)

The *Quintana II* court made the following findings of fact particularly pertinent to Petitioner's instant habeas petition:

> The PCR court found that Quintana's trial counsel did tell him about the correct penal exposure and that Quintana was cautioned that he would suffer a long sentence if he were convicted at trial. Additionally, the PCR court was convinced that regardless of the duration of the State's offer, Mr. Quintana would not have accepted a plea ... We must defer to the fact findings of a PCR judge who has held an evidentiary hearing and assessed the credibility of witnesses. The PCR judge here concluded that Quintana's testimony was not believable, and defense counsel's testimony accurately reflected what was said and discussed in 2002. In order to affirm these findings, we need only find sufficient credible evidence in the record to sustain the trial judge's findings and conclusions. Having reviewed the record of the evidentiary hearing and the earlier proceedings, we are satisfied that such evidence exists. Accordingly, Quintana did not surmount either the performance or prejudice thresholds of *Strickland*. Our review further convinces us that Quintana's *pro se* arguments are without sufficient merit to warrant discussion in a written opinion.

*Quintana II*, 2012 WL 6061700, at *3-4. (Dkt. No. 27-16 at 10.)

The New Jersey Supreme Court denied certification.  214 N.J. 116 (June 7, 2013). (Dkt.

No. 27-17.)  The U.S. Supreme Court then denied *certiorari*.  134 S.Ct. 522, 187 L. Ed.2d 376

(Nov. 4, 2013). (Dkt. No. 27-18.)

*Writ of habeas corpus*: Petitioner filed a petition for writ of habeas corpus in this Court on

November 22, 2013, (Dkt. No. 1), raising four grounds for relief: (1) "Did not know plea was

offered, did not know sent.'ing exposure"; (2) "Ineffective assistance"; (3) "Instruction of

kidnapping – incomprehensible, life term imprisonment – excessive because of double counting,

10 yr. term consec. – excessive"; and (4) "police fabrication." *Id*.  After February 25, 2014

administrative termination for Petitioner's failure to either pay the requisite $5.00 filing fee or

apply to proceed *in forma pauperis* ("IFP") (Dkt. No. 3), Petitioner filed a Motion for Leave to

Deem Appeal Filed On Time and a Notice of Appeal (Dkt. Nos. 4, 5) on February 26, 2015.

This Court then (1) re-opened Petitioner's case "solely [to] rule on plaintiff's motion for

leave to deem his notice of appeal filed on time"; (2) denied the motion; and (3) administratively

terminated the case until Petitioner tendered the $5.00 filing fee or was granted IFP status. (Dkt.

No. 7.) After Petitioner submitted a June 29, 2015 IFP application (Dkt. No. 13), this Court re-

opened the case and granted the application. (Dkt. No. 14.)

This Court's July 24, 2015 Notice and Order then provided Petitioner with the required

*Mason v, Meyers*, 208 F.3d 414 (3d Cir. 2000) notice of the consequences of the Petition under

the Antiterrorism Effective Death Penalty Act ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr.

24, 1996).  The Notice gave Petitioner:

> [T]he option, if you desire, to withdraw your petition in order to
> submit an amended petition that includes additional claims.  It is
> important that you include **all** of your claims in your first petition,
> because you probably will not have another opportunity to assert
> them.  The purpose of this order is to give you one last chance to
> include all of your claims.  You have thirty days to choose one of

the following options: ***Option 1***: Have the § 2254 petition (Dkt. No.
1 & 2) that you have filed be considered "as-is." ***Option 2***:
Withdraw that § 2254 petition and file an amended petition,
including all the grounds you want to assert. If you do not respond
within 30 days, [the Court] will assume you have chosen Option 1
and [the Court] will rule on your petition "as-is."

Dkt. No. 15 (emphasis in original). On August 3, 2015, Petitioner filed a response to the July 24

Order, selecting Option 2. (Dkt. No. 17.) This Court's August 11, 2015 Order gave Petitioner until

August 24, 2015 "to file his all-inclusive amended habeas petition that raises all of the claims he

wishes to pursue." (Dkt. No. 18.)

On August 25, 2015, Petitioner filed a new habeas petition, raising four grounds for relief:

(1) "Tainted jury"; (2) "Did <u>NOT</u> know sentencing exposure"; (3) "Police fabrication"; and (4)

"Institutional bias." (Dkt. No. 19) (emphasis in original). This Court ordered an answer to the

Petition from Respondents[3] (Dkt. No. 20), who filed an Answer on October 14, 2015 (Dkt. Nos.

23, 25-27) and contended that (1) the Petition's four grounds were previously raised and rejected

on PCR, and (2) Petitioner had not cited any decision by the U.S. Supreme Court that was

misapplied by any of the state courts. (Dkt. No. 23 at 29-34.) Respondents also asserted three

affirmative defenses: (1) untimeliness of the Petition under AEDPA's one-year statute of

limitations[4]; (2) procedural bar of prior direct appeal and PCR adjudications of the previously-

---

[3] Respondents to the Petition are Stephen D'Ilio (Administrator, New Jersey State Prison), John
Jay Hoffman (Acting Attorney General of the State of New Jersey), and the Essex County
Prosecutor's Office (collectively, "Respondents"). Attorney General Hoffman has since been
replaced, and the current Attorney General is Christopher Porrino.

[4] Respondents argue that the August 25, 2015 Petition should be denied as filed beyond
AEDPA's statute of limitations. (Dkt. No. 23 at 35-39.) Respondents suggest that "the [AEDPA
one-year] statute of limitations [in 28 U.S.C. § 2244(d)(1)] began to run on January 17, 2007 (90
days from [when the Supreme Court of New Jersey denied certification on] October 19[,] [2006]
... [T]he [August 2015] petition ... did not toll the statute of limitations." (Dkt. No. 23 at 38, 39.)
Respondents' argument overlooks the fact that Petitioner pursued direct review all the way to the
U.S. Supreme Court, which denied the petition for *certiorari* on November 4, 2013. (Dkt. No.

raised and previously-decided issues in the Petition (other than the ineffective assistance of counsel issue); and (3) Petitioner's failure to state a federal constitutional claim cognizable in a § 2254 habeas petition. (Dkt. No. 23 at 35-41.) On November 2, 2015, Petitioner filed a Reply to Respondents' Answer, again referencing his purported lack of knowledge of the "sentencing exposure" by virtue of the trial judge's lack of "due diligence" (Dkt. No. 24 at 3); violation of his "due process rights during the plea process" (*id*. at 4); "no assurance of a satisfactory plea hearing" (*id*. at 7); and "ineffective assistance of counsel" (*id*. at 9).

## V. **LEGAL STANDARD**

28 U.S.C. § 2254(d) of AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

27-18.) Under 28 U.S.C. § 2244(d)(1)(A), AEDPA's "1-year period of limitation ... shall run from the latest of ... (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Here, Petitioner's judgment of conviction became final when the U.S. Supreme Court denied *certiorari* on November 4, 2013; AEDPA's one-year limitations period thus expired on November 4, 2014. However, this Court's July 24, 2015 Notice and Order (Dkt. No. 15) gave Petitioner the option of withdrawing his original November 2013 Petition (Dkt. No. 1) and filing an amended petition, which he did. (Dkt. Nos. 17, 19.) This Court's August 11, 2015 Order gave Petitioner until August 24, 2015 "to file his all-inclusive amended habeas petition that raises all of the claims he wishes to pursue." (Dkt. No. 18). Giving Petitioner the benefit of the "prisoner mailbox rule" (*see Houston v. Lack*, 487 U.S. 266, 276 (1988)), the Court deems the Petition as having been filed on the date on which Petitioner signed it, August 18, 2015. (Dkt. No. 19 at 17.) The August 2015 Petition was, therefore, timely filed.

AEDPA "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "If [AEDPA's] standard is difficult to meet, that is because it was meant to be. [Section] 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id*. The statute prohibits a grant of habeas relief "unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of [the United States Supreme] Court, 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); or that it 'involved an unreasonable application of' such law, § 2254(d)(1); or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)." *Harrington*, 562 U.S. at 100.

A state court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth" in Supreme Court precedent, *Williams*, 529 U.S. at 405, or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different" from that reached by the Supreme Court, *id*. at 406. A state court decision is "an unreasonable application of" clearly established federal law if it 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013) (citing *Williams*, 529 U.S. at 407-08). The phrase "clearly established Federal law . . . refers to the holdings, as opposed to the dicta" of the U.S. Supreme Court's decisions. *Williams*, 529 U.S. at 412. A federal court "may not grant habeas relief merely because [the court] believe[s] that 'the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quotation omitted). "Rather, that application must be objectively unreasonable." *Id*. (quotation omitted). Thus, "even a strong case for relief does not

mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 88 (citation omitted)." *See also Eley*, 712 F.3d at 846. In other words, an "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. *Eley*, 712 F.3d at 846 (quoting *Renico*, 559 U.S. at 773).

This "analysis under AEDPA follows a prescribed path. [A court] must first 'determine what arguments or theories supported or ... could have supported, the state court's decision.' *Harrington*, 562 U.S. at 102. A reviewing court must next "ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* Finally, a court may, at last, grant habeas relief only if the petitioner demonstrates that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id. See also Eley*, 712 F.3d at 846-47.

Section 2254(d)'s standards apply to the last reasoned state court decision, *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2009), and when a state court summarily rejects a federal claim, it may be presumed that the decision was on the merits, and deference is given. *Harrington*, 562 U.S. at 99. Further, Section 2254(d)'s standards demand that state court decisions be given the benefit of the doubt. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011). The petitioner has the burden of proof. *Id.* Review under § 2254(d) is limited to "the record that was before the state court that adjudicated the claim on the merits." *Id.* Moreover, even if a petitioner demonstrates error, the court will grant the writ only if the error was not harmless.

## VI.   DISCUSSION & ANALYSIS

### A.   *Petition Ground One: Tainted Jury*

Ground One alleges "tainted jury" and states that "[a]t the time of trial a court employee alerted the court by letter & in person that the jurors were bias[ed] & spoke of the case openly in 5 different places, & judge was inadequate in providing protection" (hereinafter "Tainted Jury Claim"). (Dkt. No. 19 at 6.)  Under § 28 U.S.C. 2254(b)(1)(A), a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991).

#### 1.   *Exhaustion of Tainted Jury Claim*

a.   *Direct appeal*: Petitioner arguably raised the issue of jury taint in his supplemental *pro se* brief on direct appeal: "Det. Spellman ... indicated that Det. Brown and I were falling over fences & that he forgot to pat me down[,] which is contradictory to Det. Brown's claims. The depictions appealed to the jury's visible disgust towards me, specifically since knowing that jurors & or potential jurors spoke openly about the case in five different places. This is what's called 'Appealing to the passion of the jury.'" (Dkt. No. 26-9 at 8.)

After addressing the five grounds[5] that had been raised in the direct appeal brief of Petitioner's counsel (Dkt. No. 26-7), the *Quintana I* court noted they had "also considered defendant's *pro se* brief [Dkt. No. 26-9], and we find that all the arguments made therein are without sufficient merit to warrant discussion in a written opinion. *R*. 2:11-3(e)(2)." (Dkt. No. 27-1 at 26).  Thus, the Appellate Division considered Petitioner's arguments concerning the jury in

---

[5] The five grounds raised in the direct appeal brief of Petitioner's counsel were the identification instruction; the jury instruction on expert testimony; the jury instruction on kidnapping; the imposition of a lifetime term; and the imposition of a ten-year term consecutive to the lifetime term. (Dkt. No. 26-7 at 3-4.)

his direct appeal. (Dkt. No. 26-9 at 8.) However, Petitioner's arguments in his direct appeal concerning the jury are different than those he currently sets forth. On direct appeal, Petitioner focused on witness testimony and how it allegedly appealed to the jury's passion. To be sure, Petitioner referenced a portion of his current claim by asserting that the jurors "spoke openly about the case in five different places[,]" but that allegation does not appear to be the basis of Petitioner's direct appeal argument.

        b. _PCR_: Petitioner did not raise his concerns of a "tainted jury" in his PCR submissions (Dkt. Nos. 27-3, 27-13 and 27-15) or in the PCR briefs of his counsel. (Dkt. Nos. 27-5, 27-10 and 27-12.)

        c. _Habeas review_: The Appellate Division's _Quintana I_ opinion (Dkt. No. 27-1) is the relevant state court judgment regarding the Tainted Jury Claim. _See Ylst v. Nunnemaker_, 501 U.S. 797, 803 (1991) (habeas courts are to review the last reasoned state court judgment on an issue).

        A procedural default foreclosing habeas relief occurs not only when the petitioner fails to exhaust all available state court remedies but also when "the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." _Coleman v. Thompson_, 501 U.S. 722, 735 n. 1 (1991). New Jersey Court Rule 3:22-4 would support a state court's procedural bar of the Tainted Jury Claim since the claim was "not raised in the proceedings resulting in the conviction, or in a post-conviction proceeding," and Petitioner has not demonstrated that the Tainted Jury Claim "(1) could not reasonably have been raised in any prior proceeding; or (2) that enforcement of the bar ... would result in fundamental injustice; or (3) that denial of relief would be contrary to a new rule of constitutional law under either the Constitution of the United States or the State of New Jersey."

New Jersey Court Rule 3:22-4(a).[6] In short, a state court could find the Tainted Jury Claim in Ground One procedurally barred pursuant to New Jersey Court Rule 3:22-4 because Petitioner did not raise its testimony-based jury taint issue during his direct appeal or PCR proceedings, even though he possessed all the facts necessary to the claim and had every opportunity to raise it during the prior state proceedings.

A petitioner might nevertheless obtain federal habeas review of procedurally defaulted claims if he "demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750). Petitioner has not offered facts demonstrating either the requisite cause or actual prejudice to avoid Rule 3:22-4's procedural bar. Thus, the Court denies the Tainted Jury Claim.

Furthermore, a substantive review of the claim leads the Court to conclude that it is deficient. Here, federal habeas review is limited to determining whether the *Quintana I* decision concerning the tainted jury was (1) contrary to clearly established federal law on the "tainted jury" issue, as determined by the U.S. Supreme Court, or (2) an unreasonable application of such law. 28 U.S.C. § 2254(d)(1). In other words, pursuant to AEDPA's framework described in Section V above, this Court must consider (1) whether there was clearly established federal law governing Petitioner's "tainted jury" claim at the time of the 2006 Direct Appeal Decision; and (2) if so,

---

[6] " ... A ground could not reasonably have been raised in a prior proceeding only if defendant shows that the factual predicate for that ground could not have been discovered earlier through the exercise of reasonable diligence. A denial of relief would be contrary to a new rule of constitutional law only if the defendant shows that the claim relies on a new rule of constitutional law, made retroactive to defendant's petition by the United States Supreme Court or the Supreme Court of New Jersey, that was unavailable during the pendency of any prior proceedings." New Jersey Court Rule 3:22-4(a).

whether the Appellate Division acted contrary to this clearly established law, or applied it unreasonably, in finding the "tainted jury" (Dkt. No. 19 at 6) claim to be "without sufficient merit to warrant discussion in a written opinion" (Dkt. No. 27-1 at 26) when Petitioner alleged that "the jurors were bias[ed] & spoke of the case openly in 5 different places." (Dkt. No. 19 at 6.)

*2. "Clearly Established Federal Law" as to "Tainted Jury"*

The Sixth Amendment provides, in relevant part, that "the accused shall enjoy the right to a ... trial[ ] by an impartial jury [.]" U.S. Const. amend. VI. The right to trial by an impartial jury "guarantees ... a fair trial by a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). This right prohibits "any private communication, contact, or tampering directly or indirectly, with a juror during trial about the matter pending before the jury." *Remmer v. United States*, 347 U.S. 227, 229 (1954). The Sixth Amendment's "impartial jury" guarantee is applicable to states through the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145 (1968).

The U.S. Supreme Court has distinguished between *external* influences upon a jury, as in *Remmer*, and *internal* ones. *See Tanner v. United States*, 483 U.S. 107, 117 (1987) (refusing to grant defendant's request for an evidentiary hearing on jurors' alleged use of alcohol and drugs during trial because a hearing would allow inquiry "into the internal processes of the jury"). The *Tanner* Court explained "the near-universal and firmly established common-law rule [that] flatly prohibit[s] the admission of juror testimony to impeach a jury verdict":

> Exceptions to the common-law rule were recognized only in situations in which an "extraneous influence" was alleged to have affected the jury. In situations that did not fall into this exception for external influence, however, the Court adhered to the common-law rule against admitting juror testimony to impeach a verdict. Lower courts used this external/internal distinction to identify those instances in which juror testimony impeaching a verdict would be admissible. Federal Rule of Evidence 606(b) is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous

influences. [Rule 606(b)'s] legislative history support[s] [its] most reasonable reading -- that jurors [may not testify] ... about 'outside influence[s]' to impeach their verdict."

*Tanner*, 483 U.S. at 117-24. *See also Suarez v. Mattingly*, 212 F. Supp.2d 350, 355 (D.N.J. 2002) ("The validity of a verdict may only be challenged where there is evidence of extraneous prejudicial information or an outside influence which may have affected the jury in its ability to render a verdict. Where the problem is an intra-jury issue, courts have consistently held that the sanctity of the jury's verdict should not be disturbed") (citing *Tanner*).

The distinction between internal and external jury influences is critical because no judicial inquiry obligation is imposed with regard to an internal jury influence. In fact, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation," *Smith v. Phillips*, 455 U.S. 209, 217 (1982), such as internal conversations among fellow jurors. It is thus clearly established under Supreme Court precedent that (1) external influences on the jury deliberation process are distinct from internal influences; and (2) the constitutional guarantee of trial by an impartial jury does not require judicial consideration of allegations regarding influences internal to the jury deliberation process. *See also* Fed. R. Evid. 606(b) (indicating that courts can inquire only as to outside influences over a jury's deliberations and prohibiting inquiry into the intra-jury deliberative process). This clearly established Supreme Court precedent was available at the time of Petitioner's conviction to guide the Appellate Division's adjudication of his claim of "tainted jury."

As to the distinction between internal and external jury influences, an influence is not an internal one under clearly established Supreme Court precedent if it (1) is extraneous prejudicial information (*i.e.,* information that was not admitted into evidence but nevertheless bears on a fact at issue in the case, *see Parker v. Gladden*, 385 U.S. 363, 364 (1966) (per curiam); *Turner v.*

*Louisiana*, 379 U.S. 466, 473 (1965)); or (2) is an outside influence upon the partiality of the jury, such as "private communication, contact, or tampering ... with a juror." *Remmer*, 347 U.S. at 229.

Here, Petitioner claims "that the jurors spoke of the case openly in 5 different places." (Dkt. No. 19 at 6.) Such purported conversations among the jurors do not constitute "extraneous prejudicial information" or "an outside influence upon the partiality of the jury." *See Remmer*, 347 U.S. at 229. Therefore, clearly established federal law at the time of Petitioner's conviction supported the *Quintana I* decision that found Petitioner's tainted jury claim to be "without sufficient merit." (Dkt. No. 27-1 at 26.)[7]

Petitioner's failure to specify the particular timing of the challenged juror communications during the chronology of trial also fails to support his argument. However, assuming that Petitioner is claiming that the communications began before formal deliberations, the Court's decision would be the same:

> [Although] [i]t is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body [and] [d]espite the importance of the prohibition against all premature discussions, there is a clear doctrinal distinction between evidence of improper *intra*-jury communications and *extra*-jury influences. It is well-established that the latter pose a far more serious threat to the defendant's right to be tried by an impartial jury ... [W]hen there are premature deliberations among jurors with no allegations of external influence on the jury, the proper *process* for jury decision-making has been violated, but there is no reason to

---

[7] Of note, the trial court had observed that the evidence was not only sufficient but was, in fact, "overwhelming" to sustain Petitioner's conviction and sentence. (Dkt. No. 25-9 at 14-15) ("I don't know that the evidence in any case could be any stronger than the evidence in this particular case ... This is a case in which the State presented DNA evidence. This is a case in which the off-duty police officer witnessed Mr. Quintana coming out from behind the house where the victim was raped. This is a case in which the off-duty police officer chased Mr. Quintana from the point of the incident until he caught him. This is a case in which the victim immediately identified Mr. Quintana"). In short, the trial court found that there was more than a legally sufficient evidentiary basis for the jury to find Petitioner guilty.

doubt that the jury based its ultimate decision only on evidence formally presented at trial. Moreover, the trial judge has discretion, both in cases involving intra-and extra-jury misconduct, to decide how to deal with a situation in which there is an allegation of jury misconduct, including premature jury deliberations. This discretion extends to the determination of whether prejudice has been demonstrated. As we have explained, "[t]he trial court is obviously in a better position (than the appellate court) to observe the impact of premature jury discussions of guilt, and to make a considered judgment as to the effectiveness of a cautionary instruction."

*U.S. v. Resko*, 3 F.3d 684, 688-90 (3d Cir. 1993) (emphasis in original) (internal citations omitted). Petitioner referred at the sentencing hearing to "proof of [the jury's] bias when the County employee sent you[r] [Honor] a letter detailing that jurors were discussing this case outside the courtroom" (Dkt. No. 25-9 at 6), but Petitioner has never identified the supposed point at trial when these juror discussions occurred. That specificity omission does not alter the "clearly established federal law" habeas analysis because the challenged discussions were "internal" to the jury and are thus foreclosed from judicial inquiry.

This result is not contrary to justice in this particular case, given that the trial judge saw no grounds to voir dire jurors about the alleged discussions. Exercising its "discretion to determin[e] whether prejudice has been demonstrated, *Resko*, 3 F.3d at 690, the trial court stated in the sentencing hearing transcript:

> I've listened to the State and the defense present their arguments as it relates to sentencing ... [I]n the face of overwhelming evidence, Mr. Quintana maintains his innocence. I believe that … his denial in the face of such strong evidence, not evidencing remorse, is reprehensible. A jury of 12 individuals listened to the evidence and adjudicated Mr. Quintana guilty of every charge in the indictment. I don't know that the evidence in any case could be any stronger than the evidence in this particular case.

Dkt. No. 25-9 at 13-16. This implicit determination of jury non-prejudice by the trial judge arose from the court's unique ability to assess the situation and to evaluate the jurors' impartiality,

given that the trial court had heard counsel's presentations and had observed the jury's demeanor; accordingly, there was no abuse of discretion with respect to the trial court's treatment of Petitioner's claims of "jurors discussing this case outside the courtroom." (Dkt. No. 25-9 at 6.) *United States v. Stansfield*, 101 F.3d 909, 914 (3d Cir. 1996) (trial court's handling of allegations of irregularities in jury deliberations is reviewed for abuse of discretion); *United States v. Thornton*, 1 F.3d 149, 155 (3d Cir. 1993) (citing with approval *Grooms v. Wainwright*, 610 F.2d 344, 347 (5th Cir. 1980) ("The judge's decision whether to interrogate the jury about juror misconduct is within his sound discretion, especially when the alleged prejudice results from statements made by the jurors themselves, and not from media publicity or other outside influences")); *Government of the Virgin Islands v. Dowling*, 814 F.2d 134, 137 (3d Cir. 1987) ("the trial judge develops a relationship with the jury during the course of a trial that places him or her in a far better position than an appellate court to measure what a given situation requires").

Having identified the clearly established federal law governing Petitioner's "tainted jury" claim, this Court must now determine whether the Appellate Division acted contrary to this clearly established law, or applied it unreasonably, in finding such claim "without sufficient merit." (Dkt. No. 27-1 at 26.) AEDPA § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.

    *3.*   *The Quintana I Decision Was not Contrary to Clearly Established Federal Law regarding Jury Taint*

As discussed, "[a] federal habeas court may issue the writ [of habeas] under the 'contrary to' clause [of § 2254(d)(1)] if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

The *Quintana I* court's determination that Petitioner's claim of jury taint -- allegedly from internal conversations among jurors regarding Petitioner's trial -- was "without sufficient merit to warrant discussion" (Dkt. No. 27-1 at 26) does not contradict federal law.   The Supreme Court of the United States has recognized that (a) the constitutional guarantee of an impartial jury does not require judicial consideration of allegations regarding influences internal to the jury deliberation process; and (b) the sanctity of the jury's verdict should not be disturbed where the issue is intra-jury communications. *Tanner*, 483 U.S. at 117-24; *Suarez*, 212 F. Supp.2d at 355; Fed. R. Evid. 606(b).   Moreover, Petitioner does not contend that the facts of his case are materially indistinguishable from *Tanner*.   Thus, the Appellate Division's adjudication of Petitioner's Tainted Jury Claim was not contrary to *Tanner*.

4. *The Quintana I Decision Was not an Unreasonable Application of Clearly Established Federal Law as to Jury Taint*

A federal habeas court "may grant relief under the 'unreasonable application' clause [of § 2254(d)(1)] if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and an unreasonable application is different from an incorrect one."   *Bell*, 535 U.S. at 694. That is, under the "unreasonable application" clause of § 2254(d)(1), courts look to whether the state court's application of law was "objectively unreasonable" and not simply whether the state court applied the law incorrectly.   *Williams*, 529 U.S. at 411.   In addition, as to the allegations raised here, the Supreme Court has cautioned: "The integrity of jury proceedings must not be jeopardized by unauthorized invasions."   *Remmer*, 347 U.S. at 229.

Here, Petitioner did not allege any third party communication with a juror that could have jeopardized the integrity of his conviction at trial.   Nor did he complain of any outside influence

or that any extraneous prejudicial evidence was provided to the jury. Rather, Petitioner's allegation centers on jurors having "spoke[n] openly about the case in five different places" (Dkt. No. 26-9 at 8) -- that is, intra-jury influences *internal* to the jurors' deliberative process. As noted, only external influences on juries are subject to judicial inquiry under clearly established federal law. *Tanner*, 483 U.S. at 117. Therefore, the Appellate Division's adjudication of Petitioner's "tainted jury" claim was not an objectively unreasonable application of clearly established federal law, and its failure to order a hearing on the jury taint claim was not an abuse of discretion.

There was no constitutional error in *Quintana I* vis-à-vis Petitioner's allegations of a tainted jury. Petitioner has failed to show that the Appellate Division's decision was contrary to or was an unreasonable application of clearly established Supreme Court precedent, and he is not entitled to habeas relief on his Tainted Jury Claim in Petition Ground One.

### B. *Petition Ground Two: "Did Not Know Sentencing Exposure"*

Ground Two alleges that Petitioner "did not know sentencing exposure" due to (1) ineffective assistance of counsel arising from his attorney's alleged failure to inform him of a plea deal and his sentencing exposure if convicted (hereinafter "Ineffective Assistance Claim"); and (2) lack of notice to Petitioner from the trial court of his sentencing exposure (hereinafter "Court Notice Claim").[8] (Dkt. No. 19 at 8.)

#### 1. *Ineffective Assistance Of Counsel Claim*

##### a. *Exhaustion of Ineffective Assistance Claim*

---

[8] Petitioner writes: "Judge went contrary to trial memo instruction & law when he failed to mention the offer of a plea & the ramifications of refusing said plea. Counsel was just as wrong in failing to inform, & was increasingly abysmal as he perjured himself in post-conviction ... This was a PCR issue under 'Ineff. Ass.' & I didn't learn of ... plea offer until PCR." (Dkt. No. 19 at 8.)

*Direct appeal*: Petitioner did not raise the claim on direct appeal. Dkt. Nos. 26-7 at 3-4 and 26-9 at 4.

*PCR*: Petitioner asserted the ineffective claim during PCR but failed to raise the allegations concerning the trial court. Petitioner's June 29, 2011 letter brief argued that "trial counsel was ineffective by failing to adequately advise him regarding his penal exposure." (Dkt. No. 27-10 at 2-3.) Petitioner's other claims concerning ineffective assistance first proceeded through PCR. First, the PCR court denied relief on December 17, 2009. (Dkt. No. 27-6.), and Petitioner appealed on June 24, 2010. (Dkt. No. 27-7). On December 17, 2010, the Appellate Division remanded for findings of fact and conclusions of law. (Dkt. No. 27-8). The PCR court's April 1, 2011 opinion explained the reasons for denying PCR relief and reserved decision on one issue raised for the first time at the post-remand oral argument: "whether Petitioner was advised by his trial counsel as to the sentencing exposure he faced if convicted." (Dkt. No. 27-9 at 3). This is the Ineffective Assistance Claim issue currently before the Court.

On December 2, 2011, Petitioner and his trial counsel testified at the post-remand evidentiary hearing on the issue of "whether [Quintana] was advised by his trial counsel as to the sentencing exposure he faced if convicted." (Dkt. No. 27-16 at 5.) At the conclusion of the evidentiary hearing, the PCR court rejected Petitioner's professed lack of knowledge of the plea deal and sentencing exposure, instead finding credible the testimony of trial counsel that was to the contrary:

> [Petitioner's counsel] Mr. Ianetti testified that at different stages he advised the defendant about accepting a plea and he advised the defendant about not going to trial. I accept that as a fact and find that is a fact.
>
> I find that in this particular case, there were five first-degree crimes ... [Mr. Quintana] had two judges and two defense counsel. And Mr.

24

> Quintana's position is that no one ever advised him that the penalty, not even at arraignment, was 20 years. I find that to be unbelievable. I accept the testimony of Mr. Ianetti as being credible. I find that Mr. Quintana was aware of the exposure in this case ... I find that he was aware that his exposure was more than 15 years. But I find this, even if those weren't true, Mr. Quintana maintained his innocence throughout this trial, he would not have taken a plea. And that, to me, makes the difference in this case.
>
> Whether he received a plea offer of 10 years or 15 years, I'm satisfied that 15 years ... were not enough for him to take a 15-year plea. And so I am convinced that Mr. Quintana, even if he would have known, would not have accepted a plea. But I do find that he did know of the maximum exposure and deny his claim for post-conviction relief.

(Dkt. No. 23 at 31; Dkt. No. 27-16 at 6.);

In *Quintana II*, the Appellate Division affirmed denial of PCR relief, agreeing with the PCR court's factual findings and holding that Petitioner had not surmounted the two thresholds (objective reasonableness and prejudice) for a colorable ineffective assistance of counsel claim under the governing law of *Strickland v. Washington*, 466 U.S. 668 (1984). (*Quintana II* (Dkt. No. 27-16 at 10)). The *Quintana II* court was satisfied that sufficient credible evidence existed in the record to sustain the trial judge's findings and conclusions regarding Petitioner's knowledge of his sentencing exposure. (*Id.*).

> b. *The Quintana II Court Reasonably Applied the Strickland Standard to the Ineffective Assistance Claim*

The Court finds that Petitioner is not entitled to habeas relief on the Ineffective Assistance Claim. As noted above, a federal court is precluded from granting habeas relief on any claim decided in a state court unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 404-05; *Fountain v. Kyler*, 420 F.3d 267, 272-273 (3d Cir. 2005). The controlling U.S. Supreme Court

case for an ineffective assistance of counsel claim is *Strickland v. Washington*, 466 U.S. 668 (1984).

Per *Strickland*, a claim of ineffectiveness has two requisite components. First, the defendant must show that counsel's performance was deficient. *Strickland*, 466 U.S. at 687. This requires showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment. *Id.* Second, a defendant must show that the deficient performance prejudiced the defense. *Id.* This prong requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable. *Id.* at 687. A petitioner must prove both prongs to establish ineffective assistance. Consequently, only the "rare claim" of ineffectiveness will succeed. *Buehl v. Vaughn*, 166 F.3d 163, 169 (3d Cir.), *cert. denied*, 527 U.S. 1050 (1999).

In addition, even if trial counsel is found to have satisfied the *Strickland* standard by performing deficiently and prejudicing the defense, a habeas corpus petition fails unless the petitioner can show that the state court's resolution of his ineffectiveness claim is an objectively unreasonable application of the highly demanding *Strickland* standard. 28 U.S.C. § 2254(d)(1); *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002). It is not enough to convince a federal habeas court that, in its independent judgment, the state–court decision applied *Strickland* incorrectly. *Bell*, 535 U.S. at 698-699. Such claims succeed only if state court treatment of the ineffectiveness claim is not simply erroneous, but objectively unreasonable as well. *Berryman v. Morton*, 100 F.3d 1089, 1103 (3d Cir. 1996).

The *Quintana II* court expressly applied *Strickland* to this case (Dkt. No. 27-16 at 7-10), and so this Court must be "doubly deferential" on habeas review. *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) ("When the claim at issue is for ineffective assistance of counsel, AEDPA

review is 'doubly deferential,' because counsel is 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.' *Burt v. Titlow*, 134 S.Ct. 10, 17 (2013). In [such situations], federal courts are to afford both the state court and the defense attorney the benefit of the doubt").  *See also* 28 U.S.C. § 2254(d)(1) (where the state court has already rejected an ineffective assistance of counsel claim, a federal court must defer to the previous decision and may grant habeas relief if the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States").

As noted, the *Quintana II* court rejected the Ineffective Assistance Claim.  As to the firs prong of the *Strickland* test, the Appellate Division noted that "[t]he PCR court found that Quintana's trial counsel did tell him about the correct penal exposure and that Quintana was cautioned that he would suffer a long sentence if he were convicted at trial ... The PCR judge here concluded that Quintana's testimony was not believable, and defense counsel's testimony accurately reflected what was said and discussed in 2002." (Dkt. No. 27-16 at 9-10.)  The Appellate Division reasonably applied the performance prong of the *Strickland* test.

As to the prejudice prong of the *Strickland* standard, the court in *Quintana II* observed that "the PCR court was convinced that regardless of the duration of the State's offer, Mr. Quintana would not have accepted a plea." (*Id*. at 9.)  The Appellate Division reasonably applied the prejudice prong of the *Strickland* test. *United States v. Day,* 969 F.2d 39, 44-46 (3d Cir. 1992) (To prove ineffective assistance of counsel at the plea bargaining stage, the petitioner must prove: (1) that a plea offer was extended by the government, and (2) that a reasonable probability exists that he would have accepted the plea offer and the court would have approved the agreement); *State v. Taccetta*, 200 N.J. 183, 193-95 (2009) (ruling that where defendant repeatedly stated at trial that

he was innocent and later alleged ineffective assistance of counsel as to sentencing consequences, that defendant was not prejudiced by counsel's actions because if defendant would have accepted a plea agreement, he could not have provided a truthful factual basis when entering a guilty plea and the plea would not have been accepted by the court). In short, Petitioner could not have provide a truthful factual basis to any plea because he maintained his innocence throughout trial and appeal (Dkt. No. 25-9 at 26:10-11) – a position he continues to maintain. Thus, Petitioner would have been compelled to go to trial. For that reason, he cannot establish the *Strickland* prejudice prong – *i.e.*, that "but for" counsel's alleged deficient performance, the result would have been different, *i.e.* that he would have accepted a plea offer.

The Appellate Division's determinations in *Quintana II* on the performance and prejudice prongs of Petitioner's ineffective assistance of counsel claim were "not contrary to nor an unreasonable application of clearly established federal law" (28 U.S.C § 2254(d)(1)) nor based on an "unreasonable determination of the facts" in light of the PCR court's findings of fact and credibility determinations (28 U.S.C. § 2254(d)(2)). The Appellate Court's decision regarding Petitioner's claim that his counsel did not inform him of the plea offer and sentencing exposure was not an objectively unreasonable determination of the facts or contrary to clearly established federal law.  28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct."); *Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir. 2000) ("the AEDPA increases the deference federal courts must give to the factual findings and legal determinations of the state courts").

In short, if Petitioner failed to meet either the performance prong or the prejudice prong, his Ineffective Assistance Claim would be unsuccessful. Here, Petitioner has failed to satisfy both prongs.

The Ineffective Assistance Claim does not meet the deferential standard. *Woods*, 136 S. Ct. at 1151. Petitioner does not point to a ruling by the Appellate Division on *Quintana II* that is contrary to, or an unreasonable application of, the constitutional jurisprudence of *Strickland*, and he does not identify any U.S. Supreme Court precedent that the *Quintana II* court unreasonably applied. Petitioner has not carried his burden of showing that *Quintana II*'s findings of fact were objectively unreasonable. Therefore, his Ineffective Assistance of Counsel Claim must be denied habeas relief.

## 2. *Court Notice Claim in Ground Two*

Beyond Ground Two's attack on counsel's effectiveness, it also challenges lack of notice from the trial court as to a plea offer and sentencing exposure: "[D]id not know sentencing exposure. [The trial] judge failed to mention the offer of a plea & the ramifications of refusing said plea ... [and] the judge was crass. This was a PCR issue under 'Ineff. Ass.' & I didn't learn of court's duty to inform & plea offer until PCR." (Dkt. No. 19 at 8.) Petitioner raises this claim for the first time in the current matter.

As noted *supra* in this opinion with regard to procedural default under New Jersey Rule 3:22-4(a), "if [a] petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred[,] ... there is a procedural default for purposes of federal habeas [review.]" *Coleman*, 501 U.S. at 735 n.1; § 28 U.S.C. 2254(b)(1)(A) (a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims).

As noted, Petitioner did not raise the Court Notice Claim during either direct appeal or PCR proceedings. Rather, he focused on allegations that his *counsel* supposedly failed to inform

him of the plea offer and sentencing exposure: that is, with respect to Petitioner's knowledge of the "offer of a plea" and the trial judge's alleged "fail[ure] to mention the offer of a plea & the ramifications of refusing said plea[.]" (Petition, Dkt. No. 19 at 8) Petitioner's arguments to the state courts about his knowledge of the plea were limited to challenges concerning alleged faults of his *counsel* -- not of the *trial court*. Dkt. No. 27-12 (Petitioner's April 9, 2012 brief on PCR appeal claiming "trial counsel failed to communicate to defendant the State's plea offer"); Dkt. No. 27-13 at 5 (April 25, 2012 pro se letter brief on PCR appeal, contending that Petitioner "felt pressured by counsel into going to trial because counsel failed to outline any alternatives"); and Dkt. No. 27-15 at 2 (Petitioner's supplemental pro se letter brief, regarding "fresh eyes in the matter of my not knowing of a plea deal, the option to plea, or the sentencing exposure"). His relevant arguments to the state courts do not mention the trial judge actions as a basis for relief.

"Federal courts may not consider the merits of a procedurally defaulted claim unless the applicant establishes 'cause' to excuse the default and actual 'prejudice' as a result of the alleged violation of the federal law or unless the applicant demonstrates that failure to consider the claim will result in a fundamental 'miscarriage of justice.'" *Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir. 2002) (quoting *Coleman*, 501 U.S. at 750). Accordingly, Petitioner's failure to exhaust the Court Notice Claim triggers the procedural bar of New Jersey Court Rule 3:22-4(a), and habeas relief is therefore unavailable on this claim.

Furthermore, beyond Petitioner's failure to exhaust the Court Notice Claim, the claim does not raise a cognizable federal claim. Petitioner has not demonstrated that the trial court's supposed failure to inform him of the existence of a plea offer violates a federal right derived from the Constitution, laws, or treaties of the United States. The claim does not include the requisite reference to a specific federal constitutional guarantee. The Due Process Clause (U.S. Const.

amend. XIV) requires only that a defendant's plea be voluntarily and intelligently entered, *Boykin v. Alabama*, 395 U.S. 238 (1969), but Petitioner here maintained his innocence at the time of trial -- and continues to do so presently. The Due Process Clause is thus inapplicable to his habeas petition. Further, there is no federal habeas relief for alleged errors in interpretation or application of state law, such as New Jersey R. 3:9-1(f) governing the content of pre-trial conferences.[9] Therefore, Petitioner's Plea Claim is not cognizable on federal habeas review. § 28 U.S.C. 2254(d)(1).[10]

---

[9]The Rule provides as follows:

> Pretrial Conference ... Unless objected to by a party, the court shall ask the prosecutor to describe, without prejudice, the case including the salient facts and anticipated proofs and shall address the defendant to determine that the defendant understands: (1) the State's final plea offer, if one exists; (2) the sentencing exposure for the offenses charged, if convicted; (3) that ordinarily a negotiated plea should not be accepted after the pretrial conference and a trial date has been set; (4) the nature, meaning and consequences of the fact that a negotiated plea may not be accepted after the pretrial conference has been conducted and a trial date has been set and (5) that the defendant has a right to reject the plea offer and go to trial and that if the defendant goes to trial the State must prove the case beyond a reasonable doubt. If the case is not otherwise disposed of, a pretrial memorandum shall be prepared. The pretrial memorandum shall be reviewed on the record with counsel and the defendant present and shall be signed by the judge who, in consultation with counsel, shall fix the trial date."

New Jersey R. 3:9-1(f).

[10] Of note, even to the extent any portion of the plea portions of the Court Notice Claim could be construed as relating to the trial court's role in events giving rise to it, the Appellate Division found Petitioner's arguments (beyond the ineffective assistance of counsel claims) to be "without sufficient merit to warrant discussion in a written opinion." (Dkt. No. 27-16 at 10.) As discussed above, the Appellate Division's ruling about Petitioner's knowledge of the plea offer was not contrary to or an unreasonable application of federal law, as the *Quintana II* court deferred to the findings of the PCR judge that Petitioner knew of the plea offer and sentence exposure at the time of trial. Thus assuming for the sake of argument only that the trial court had a duty to review the plea offer with Petitioner in light of the potential maximum exposure, the Appellate

Here, the record indicates that the trial court did review Petitioner's sentencing exposure with him. Petitioner's assertion that the trial judge "failed to mention the ramifications of refusing said plea" (Dkt. No. 19 at 8) is refuted by the record. (Dkt. No. 25-4 at 3) (Transcript of Trial) ("Court: 'First and foremost, Mr. Quintana, you should have received a trial memorandum ...' Defendant: 'Yes, sir.'") and 13 ("Court: '[G]oing further to look at ... the nature of the offense, the sentences, coupled with those offenses being 20 years ...'") The record also reflects that the trial court "talked about the plea cutoff and the trial memorandum" with defendant and counsel on the record. (Dkt. No. 25-4 at 3.) The record reveals that Petitioner understood his aggregate maximum incarceration exposure.

Unexhausted, procedurally barred, and devoid of a cognizable federal claim, Petitioner's Court Notice Claim does not merit federal habeas relief.

### C. *Petition Ground Three: "Police Fabrication"*

Ground Three alleges trial court error in admitting into evidence (Dkt. No. 25-7 at 16-17) photographs of the knife that witnesses testified was found on Petitioner at the time of the sexual assault but was not itself moved into evidence. (Dkt. No. 25-5 at 28, 29, 92) Petitioner denied possession of the knife. (Dkt. No. 26-9 at 22-23).[11] Ground Three asserts further error in admitting

---

Division affirmed the finding that Petitioner's counsel had already done so. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Petitioner has not carried such burden here.

[11] The trial transcript reflects the following:

> Mr. Ianetti: Your Honor, my objection is ... the knife doesn't exist. There's no record of it being logged into the property room. To bring in a photograph of a knife that is indistinguishable from probably a million other knives that this manufacturer has made, when it's not found at the scene and it's not available. I just think it's prejudicial to the defendant.
>
> Ms. Trifari: Judge, I think that the fact that we don't have the knife is different

into evidence (Dkt. No. 25-76 at 12-16) the handwritten version of the City of Newark forensic lab's report that listed all evidence received from Newark's Police Department (Dkt. No. 25-6 at 45) but did not list the victim's white panties examined by the lab. (Dkt. No. 25-6 at 36, 42, 44.) (Ground Three's claims are hereinafter referred to collectively as the "Police Fabrication Claim.")

### 1. *Exhaustion of Police Fabrication Claim*

a. *Direct appeal*: In his September 2005 supplemental *pro se* brief on direct appeal, Petitioner raised "police fabrication" as to the prosecutor's contention that Detective Brown discovered a knife in Petitioner's possession in a physical confrontation between them during Petitioner's apprehension and arrest. Petitioner's direct appeal brief challenged the *fact* of supposed discovery of a knife in his possession at the time of the crime, but did not challenge *admission* of knife photos into trial evidence. (Dkt. No. 26-9 at 20-24.) On July 28, 2006, the Appellate Division in *Quintana I* affirmed Petitioner's conviction and sentence. After commenting that "[i]n the circumstances of this heinous case a lifetime sentence does not shock our judicial conscience," the *Quintana I* court ruled also that it had "considered defendant's *pro se* brief, and all the arguments made therein are without sufficient merit to warrant discussion in a written opinion. *R*. 2:11-3(e)(2)." (Dkt. No. 27-1 at 26.)

---

from the fact that we have evidence that the knife existed. We have the testimony of the victim who believed there was a knife involved. We have Detective Brown who saw the knife. Testified to the photograph that that was the knife that was recovered. Detective Spellman who had the knife in her custody testified that she looked at the photo and said that was the knife ... In addition, Officer Schulthorpe testified that he recovered the knife. He also saw the knife that day and he also testified from the photo that that was the same knife he recovered from the defendant.

The Court: Certainly issues of credibility for which the jury should consider ... The pictures will be admitted as S-8 and S-9 over the objection of the defense.

(Dkt. No. 25-7 at 16-17.)

b. _PCR_: In his September 17, 2008 PCR Certification, Petitioner again challenged the knife issue as follows: "Police fabrication is a point for consideration since any physical contact between defendant and constable was one-sided."  As on direct appeal, Petitioner's PCR brief disputed the fact of supposed _discovery_ of a knife on his person right after the crime, but not the knife's _admission_ into trial evidence (Dkt. No. 27-4 at 4.)  On December 17, 2009, the state PCR court denied post-conviction relief. (Dkt. No. 27-6.) Petitioner appealed on June 24, 2010 (Dkt. No. 27-7), and on December 17, 2010 the Appellate Division remanded for findings of fact and conclusions of law. (Dkt. No. 27-8.)  On April 1, 2011, the state PCR court issued a written opinion that found "the petitioner's claims are without merit and are denied." (Dkt. No. 27-9 at 3.) On June 29, 2011, Petitioner filed a supplemental letter brief but the letter did not raise the issue of police fabrication. (Dkt. No. 27-10.)  On April 9, 2012, Petitioner appealed denial of PCR relief; his brief raised only the issue of ineffective assistance of counsel. (Dkt. No. 27-12.) In August 2012, Petitioner filed a pro se letter brief but, again, the letter did not raise the issue of police fabrication. (Dkt. No. 27-15.)  The _Quintana II_ court affirmed denial of PCR relief on December 7, 2012, ruling that Petitioner's ineffective assistance of counsel claim had not satisfied _Strickland_ and finding Petitioner's pro se arguments to be "without sufficient merit to warrant discussion in a written opinion." (Dkt. No. 27-16 at 10.)

## 2.  _The Police Fabrication Claim as Presented in Ground Three is Procedurally Barred_

The Police Fabrication Claim in the current Petition – which challenges the evidentiary _admission of the knife into evidence_ (as distinct from the _factual discovery of the knife_ on Petitioner's person after the crime, as he raised on direct appeal and PCR) – is procedurally barred pursuant to New Jersey Court Rule 3:22-4 because Petitioner did not raise it in prior state court appellate and PCR proceedings.  He had possessed all the necessary facts and every opportunity

to raise the Police Fabrication Claim prior to habeas review. *Coleman*, 501 U.S. at 735 n. 1.

Petitioner has not demonstrated that the Police Fabrication Claim "(1) could not reasonably have been raised in any prior proceeding; or (2) that enforcement of the bar ... would result in fundamental injustice; or (3) that denial of relief would be contrary to a new rule of constitutional law under either the Constitution of the United States or the State of New Jersey." New Jersey Court Rule 3:22-4(a). Since Petitioner failed to raise this issue in either his direct appeal or in his PCR proceedings, habeas relief is unavailable on this claim.

### 3. *The Police Fabrication Claim also Does not Allege a Cognizable Federal Claim of Constitutional Violation*

Substantively, Ground Three also fails for the following reasons. Habeas petitions alleging general improprieties during the state trial are not cognizable unless the error resulted in a fundamentally unfair proceeding and thus violated a petitioner's due process rights.[12] Unless a constitutional violation occurs at trial, the claim is governed by state law and is not cognizable in federal habeas proceedings. Consequently, petitions alleging specific errors in state law do not present federally cognizable issues unless the violation is demonstrated to be of constitutional magnitude. *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on

---

[12] "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984); *see also Medina v. California*, 505 U.S. 437 (1992) (noting that "the category of infractions that violate" 'fundamental fairness' to be very narrow because "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."); *Moran v. Burbine*, 475 U.S. 412, 432 (1986) (referring to "the fundamental fairness guaranteed by the Due Process Clause of the Fourteenth Amendment"); *Patterson*, 432 U.S. at 210 (the Due Process Clause "require [s] that only the most basic procedural safeguards be observed"); *Lisbena v. California*, 314 U.S. 219, 236 (1942) ("As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice").

the basis of a perceived error of state law"). It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.

Furthermore, "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983). Nor do federal courts' habeas powers permit reversal of convictions based on a belief that a trial judge incorrectly interpreted a state evidentiary rule. The only question for a habeas court is "whether the [challenged evidentiary decision or instruction] by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990).

As to the photographs of the knife, pursuant to New Jersey Rule of Evidence 901, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims." The trial judge found that N.J.R.E. 901 was satisfied with respect to the photos. (Dkt. No. 25-7 at 15-16.) The trial court essentially found that Petitioner's arguments concerning the actual knife went to the weight of the photographic evidence, not the admissibility of the images. Pursuant to N.J.R.E. 401, the evidence of the knife was relevant to specific charges alleged in the indictment. Obviously nothing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence simply because the defense chooses to contest it. Petitioner has not demonstrated that admission of the photos into evidence as trial exhibits S-8 and S-9 was fundamentally unfair in violation of the Due Process Clause. Therefore, Petitioner has not stated a cognizable federal claim as required for habeas relief.

As set forth in note 6 *supra*, the trial court had found the evidence of Petitioner's guilt "overwhelming" to sustain his conviction and sentence. (Dkt. No. 25-9 at 14-15.) The admission of the knife photographs into evidence cannot be said to have "offen[ed] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgress[ed] any recognized principle of fundamental fairness in operation." *Patterson v. New York*, 432 U.S. 197, 201-02 (1977). Thus, Petitioner's request for federal habeas relief based on the Police Fabrication Claim (Ground Three) is also denied on substantive grounds.

### B. *Petition Ground Four: Institutional Bias*

Ground Four alleges "institutional bias," claiming: "Not only does the above include the jury, but judge made misleading statements & mired the jury's charge. Evidence on defendant's behalf was also painfully restricted as full latitude was given the prosecution. Judge & jury handed down penalties for bodily injury which couldn't be deduced, proven to be a scratch." (Dkt. No. 19 at 11.) (Ground Four's claim regarding the jury is hereinafter referred to as "Jury Bias Claim"; Ground Four's claim regarding the trial judge is hereinafter the "Judge Bias Claim.")

At the outset, Petitioner's claim of institutional bias is not clearly stated. He appears to be claiming that given the nature of the charges against him, he was unable to secure a fair trial as a matter of law. Taken to its extreme conclusion, Petitioner's view would foreclose the possibility of seating a constitutionally adequate jury in any case involving a serious offense because the charges alone would be unduly prejudicial. Such an extreme interpretation and application of constitutional guarantees are at odds with precedent, logic, and common sense. In any event, Petitioner cites no authority granting habeas relief due to "institutional bias" in circumstances factually analogous to the instant case.[13] Nevertheless, because Petitioner is

---

[13] There are a few cases which discuss "institutional bias" as a basis for disqualifying a particular

proceeding *pro se*, the Court will give Petitioner the benefit of the doubt and analyze issues that Petitioner is arguably asserting. To the extent that Petitioner's arguments encompass previously decided issues, such as the admissibility of the knife photographs, they will not be readdressed here.

 1.  *Ground Four: Jury Bias Claim*

  a.  *Trial; Exhaustion On Direct Appeal*

At a pre-trial hearing, Petitioner stated: "It goes without dispute that a charge of sexual assault by its tone alone fosters an institutional bias or hatred in ordinary people even without a conviction." (Dkt. No. 25-3 at 7.) After jury selection at trial, Petitioner's counsel stated: "Your Honor, Mr. Quintana is satisfied with the jury." The trial judge observed that "the jury as presently configured is satisfactory to both the State and the defense." The trial court then asked: "Before I have you sworn in, is there anything that any of you know that would prevent you from being sworn in on this case? ... The record will reflect there's no affirmative response." (Dkt. No. 25-4 at 17.) Before trial began, the trial court instructed the jury regarding deliberations. (Dkt. No. 25-5 at 4-7). Counsel for both the State and Petitioner found these instructions acceptable. (*Id*. at 7.)

During sentencing, Petitioner's counsel stated: "[Defendant's] view is that he is subjected to what he has characterized as institutional bias. That translates into the notion that the sexual assault and the heinous nature of the offense automatically biases the people within the system

---

juror. For example, in *Biagas v. Valentine*, 2007 WL 1217976 (S.D. Tex. Apr. 23, 2007), a Section 2254 habeas petitioner challenged his theft conviction because, in part, a juror was a sheriff's deputy who allegedly harbored an "institutional law enforcement bias[.]" Of course, any potential juror whose prejudice or bias would prevent a fair trial should be excused during jury selection. But Petitioner does not raise such a claim. More importantly, Petitioner does not cite to any evidence to support such a claim. Instead, Petitioner apparently argues that he suffered from institutional bias based solely on the nature of the charges for which he was indicted.

who have to judge him. And he feels that having been subjected to that bias, he did not receive a fair trial." (Dkt. No. 25-9 at 4.)

On direct appeal, Petitioner's *pro se* supplemental brief included allegations about purported jury bias within his "Abuse of Discretion" issue: "... These discriminatory items [of] ... the unsubstantiated knife photos with unrelated envelope & the incomplete semology (sic) report which were also moved into evidence ... were left to a jury of eight women, some of whom were sexually assaulted with reservations towards defendant ... These were eight women whom I was forced to choose due to a rapidly disintegrating jury pool. I was doomed from the start." (Dkt. No. 26-9 at 10-11.) The Appellate Division in *Quintana I* ruled that it had "considered defendant's *pro se* brief, and we find that all the arguments made therein are without sufficient merit to warrant discussion in a written opinion." (Dkt. No. 27-1 at 26.)

With respect to the Jury Bias Claim, Respondents note that "the Appellate Division summarily rejected this issue," and Respondents also contend that "Petitioner has not cited to any decision by the United States Supreme Court which was misapplied by any of the State courts." (Dkt. No. 23 at 33, 34.)

> b. *The Quintana I Court's Summary Denial of Relief Was an Adjudication on The Merits as to the Jury Bias Claim*

With respect to AEDPA's "merits adjudication" requirement of 28 U.S.C.A. § 2254(d), a state court adjudicates a claim "on the merits" when it decides a petitioner's right to relief based on the substance of the federal claim, as opposed to denying the claim on a procedural or other rule precluding state court merits review. There is no requirement that a state court provide its reasoning in order for its decision to qualify as a "merits adjudication." Instead, when a state court summarily denies relief of a federal claim, a federal habeas court may presume the claim was decided on the merits and the decision is entitled to deference. *Harrington*, 562 U.S. at 99-100,

102 (holding that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (citing *Harrington*, 562 U.S. at 101 and *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). *See also Harrington*, 562 U.S. at 102 (habeas court must "ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court"). As long as "fair-minded jurists could disagree" about whether a state court's decision was correct, habeas relief is unavailable. 28 U.S.C. § 2254(d)(1). A petitioner "must show that the state court's decision to reject his claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (quoting *Harington*, 562 U.S. at 103). Additionally, a state court's adjudication may be afforded even greater deference if the state court was in the best position to resolve the particular issue.

### c. *Clearly Established Federal Law Regarding Impartial Jury*

Ground Four's bias claims allege violations of the 5th, 6th, 8th, and 14th Amendments of the Constitution. (Dkt. No. 26-9 at 13.) The Sixth Amendment's guarantee of an impartial jury, as applicable to the states through the Fourteenth Amendment, is pertinent to Petitioner's Jury Bias Claim.

### (i) *Right To Impartial Jury Under The Sixth Amendment*

As noted previously, the Sixth Amendment of the federal Constitution, made applicable to the States through the Due Process Clause of the Fourteenth Amendment, guarantees that "the

accused shall enjoy the right to a ... trial, by an impartial jury[.]" U.S. Const. amend. VI.  The

constitutional standard of fairness requires that a defendant have "a panel of impartial, indifferent'

jurors."  *Irvin*, 366 U.S. at 722.  Qualified jurors do not need to be completely ignorant of the

alleged facts and issues involved.  "To hold that the mere existence of any preconceived notion as

to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a

prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the

juror can lay aside his impression or opinion and render a verdict based on the evidence presented

in court."  *Id*. at 723.  *See also Murphy v. Florida*, 421 U.S. 794, 799-800 (1975).  A trial court's

findings of juror impartiality may "be overturned only for 'manifest error.'" *Patton v. Yount*, 467

U.S. 1025, 1031 (1984) (quoting *Irvin*, 366 U.S. 717).

(ii)     *Due Process Right To Impartial Jury In State Criminal Trials*
*Under The Fourteenth Amendment*

A criminal defendant in a state court is guaranteed an "impartial jury" by the Sixth

Amendment by way of the Due Process Clause of the Fourteenth Amendment.  *Duncan*, 391 U.S.

145; *Irvin*, 366 U.S. at 722.  *Accord Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 551 (1976)

("The Sixth Amendment in terms guarantees 'trial, by an impartial jury...' in federal criminal

prosecutions.  Because 'trial by jury in criminal cases is fundamental to the American scheme of

justice,' the Due Process Clause of the Fourteenth Amendment guarantees the same right in state

criminal prosecutions.  In essence, the right to jury trial guarantees to the criminally accused a fair

trial by a panel of impartial, 'indifferent' jurors").  "[T]he right to jury trial guarantees to the

criminally accused a fair trial by a panel of impartial, 'indifferent' jurors.  A fair trial in a fair

tribunal is a basic requirement of due process." *Turner v. State of Louisiana*, 379 U.S. 466, 471-

72 (1965) (internal citations omitted).  "Due process means a jury capable and willing to decide

the case solely on the evidence before it."  *Smith*, 455 U.S. at 217.

Jury voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion," *Connors v. United States*, 158 U.S. 408, 413 (1895), because the "determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." *Rideau v. Louisiana*, 373 U.S. 723, 733 (1963) (Clark, J., dissenting). *Accord Aldridge v. United States*, 283 U.S. 308, 310 (1931); *Ham v. South Carolina*, 409 U.S. 524, 527-28 (1973). "Thus, the State's obligation to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant." *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (citing *Ham*, 409 U.S. at 527-28). Moreover, "prominence [of news stories regarding a case] does not necessarily produce prejudice, and juror *impartiality* does not require *ignorance*." *Skilling v. United States*, 561 U.S. 358, 360-61 (2010) (emphasis in original) (internal citations omitted). "[P]retrial publicity, even pervasive, adverse publicity, does not inevitably lead to an unfair trial." *Nebraska Press*, 427 U.S. at 554.

### d. *At a Minimum, Fair-Minded Jurists could Disagree Regarding Support for Quintana I's Ruling Regarding the Jury Bias Claim*

*Quintana I* summarily denied relief of Petitioner's Jury Bias Claim. Therefore, it is presumed that the Jury Bias Claim was adjudicated on the merits. *Harrington*, 562 U.S. at 99-102.

The clearly-established principles of *Smith v. Phillips* ("a jury capable and willing to decide the case solely on the evidence before it"), *Connors v. United States* ("a great deal must, of necessity, be left to [the trial court's] sound discretion [regarding jury voir dire]"), *Ham v. South Carolina* ("one of the purposes of the Due Process Clause of the Fourteenth Amendment is to insure the[] 'essential demands of fairness'"), and *Ristaino v. Ross* ("the State's obligation to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant"), as discussed above, could have reasonably supported the *Quintana I* decision. *Quintana I* suggested no new constitutional doctrine. It overruled no line of decisions

on which Petitioner might have justifiably relied. To the contrary, it is supported by clearly established federal case law regarding the guarantees of jury impartiality and due process. *Turner*, 379 U.S. at 471-72. At worst, fair-minded jurists could have disagreed whether, on the specific facts of this case, the constitutional theories supporting *Quintana I* are consistent with the jury impartiality and jury due process holdings in these prior decisions of the U.S. Supreme Court; thus, habeas relief is unavailable on the Jury Bias Claim. Petitioner's trial counsel accepted the jury as constituted. And, importantly, Petitioner has pointed to nothing in the record to support his allegations that he was forced to acquiesce to the jury due the diminishing pool, that jurors had previously been the victim of sexual assault and indicated that they could not be fair, or that the trial court did not first excuse any jurors who could not be fair and impartial due to the nature of the charges.

In this case's circumstances, *Quintana I*'s merits adjudication of Petitioner's Jury Bias Claim was not contrary to or an objectively unreasonable application of clearly-established controlling federal precedent on jury impartiality and due process. Moreover, Petitioner has not shown "that the state court's decision to reject his claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'" *Davis*, 135 S. Ct. at 2199 (quoting *Harington*, 562 U.S. at 103). This Court is unable to conclude, in the circumstances presented in this case, that Petitioner did not receive a fair trial from an impartial jury; Petitioner has failed to show that jury selection or deliberation were inherently biased. Thus, this Court denies Petitioner's request for habeas relief based on the Jury Bias Claim of Ground Four.

2. *Ground Four: Judge Bias Claim*

a. *Exhaustion On Direct Appeal and PCR*

*Direct appeal*:  Petitioner's *pro se* supplemental brief on direct appeal alleged bias by the trial judge under Petitioner's "Abuse of Discretion" issue:

> The court must determine whether an adverse impact of the challenged evidence outweighs its probative value. In this case, [the] trial court was unconcerned with such adverse impact ... Contrary to ... [a criminal procedure rule that] probative value of evidence outweighs its prejudicial effect[,] the tile, the unsubstantiated knife photos with unrelated envelope & the incomplete semology (sic) report were moved into evidence. [D]espite trial judge's remote belief in the document's truthfulness he automatically switches gears & labels it authentic. [The] trial judge's evidentiary discretion went against N.J.R.E. 401 ... [The trial judge] heavily hindered my evidence in favor of [the State] ... [The] trial judge's excuse for censoring the photos out of respect for the jury was never mentioned beforehand ... Moreover, he evaded my question on the biological evidence. In summary, I find trial judge's judicial etiquette to be clearly erroneous & in violation of due process.

(Dkt. No. 26-9 at 10-13.)  As noted, the *Quintana I* court considered Petitioner's *pro se* brief and determined that his arguments lacked sufficient merit to warrant a written discussion. (Dkt. No. 27-1 at 26.)

*PCR*:  In his PCR certification, Petitioner alleged he "was the subject of judicial misconduct: (a) Confusing and contradictory statement by the judge in his instructions to the jury, and emphasized it in the minds of the jury, (b) Prejudicing the jury by stating that the defendant showed no remorse and therefore should receive additional punishment." (Dkt. No. 27-4 at 3.)  The PCR courts denied relief. (Dkt. Nos. 27-6 (December 17, 2009); 27-9 (April 1, 2011); 27-11 (December 2, 2011); and 27-16 at 10 (December 7, 2012.)

Respondents maintain that "Petitioner has not cited to any decision by the United States Supreme Court which was misapplied by any of the State courts." (Dkt. No. 23 at 34.)

b. *The Judge Bias Claim Fails Section 2254's Standard Of Review*

The Judge Bias Claim fails § 2254's standard of review. First, Petitioner did not raise any violation of the U.S. Constitution, laws or treaties in connection with his Judge Bias Claim on either direct appeal or PCR. This Claim cannot be construed as a federal claim. Second, Petitioner has not identified any clearly established federal law, as determined by the U.S. Supreme Court, that the state courts unreasonably applied or as to which their rulings were contrary regarding this claim. 28 U.S.C. § 2254.

Furthermore, as discussed above, habeas petitions alleging general improprieties during a state trial (such as Petitioner's Judge Bias Claim regarding evidentiary rulings) are not cognizable unless errors resulted in a fundamentally unfair proceeding and violated a petitioner's due process rights.[14] Unless a constitutional violation occurs at trial, the claim is governed by state law and is not cognizable in federal habeas review. Thus, the Judge Bias Claim alleging specific errors in state evidence rules does not present cognizable issues relevant to habeas review, given the omission of any allegations that such errors were of constitutional magnitude. *Pulley*, 465 U.S. at 41.

**VII. <u>CERTIFICATE OF APPEALABILITY</u>**

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's

---

[14] *Trombetta*, 467 U.S. at 485 (1984); *see also Medina*, 505 U.S. 437; *Moran*, 475 U.S. at 432; *Patterson*, 432 U.S. at 210; *Lisbena*, 314 U.S. at 236.

resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons discussed above, Petitioner has not met this standard, and this Court will not issue a certificate of appealability.

**VIII.    <u>CONCLUSION</u>**

For the foregoing reasons, Petitioner's habeas petition is denied.  A certificate of appealability will not issue.  An appropriate order accompanies this Opinion.


Dated: September 29, 2017

s/ John Michael Vazquez
John Michael Vazquez
United States District Judge
